MENEFEE et al. v. UNITED STATES.*

(Circuit Court of Appeals, Ninth Circuit.  November 6, 1916.)

No. 2766.

1. CONSPIRACY ⬤⇒45—EVIDENCE—ADMISSIBILITY.
    The indictment charged that defendants conspired together to use the mails in connection with their disposal of corporate stock by misrepresentations, that defendants intended to induce investors and the public to purchase the stock by means of false and fraudulent representations sent through the mails, representing that the corporation whose stock was being offered was the owner of patents to certain devices, that on account of the ownership of the patent shares were of great commercial value, and that dividends would be shortly paid, when in fact the corporation was not the owner of the patents enumerated and was not then manufacturing. The corporation did own a patent for one device, but one of the defendants, learning that there was a prior patent for a similar device, which possibly rendered the patent of the corporation of little value, notified the other defendants of that fact, and they began to sell stock owned by them individually, instead of treasury stock.  Held that, though there was no substantial issue involving the validity of the patent owned by the corporation, nevertheless in such case the existence of the prior patent and defendants' knowledge thereof was admissible on the question of their good faith in representing that the corporation was the owner of the patents as asserted.
    [Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 100–104; Dec. Dig. ⬤⇒45.]

2. CONSPIRACY ⬤⇒45—EVIDENCE—ADMISSIBILITY.
    In such case, the evidence is admissible, though there was no allegation in the indictment that the stock was worthless, or was not worth what it

was represented to be, on account of the limitations of the patent which the corporation owned, by reason of prior claims of other inventors.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 100–104; Dec. Dig. ⊜45.]

3. CRIMINAL LAW ⊜1169(5)—APPEAL—HARMLESS ERROR.

In such case, where the court charged that if a conspiracy existed, and defendants represented that the corporation owned patents to machines which they proposed to manufacture, and such representations were false, and known by defendants to be false, the conspiracy would constitute a scheme to defraud, but if, at the time the representations were made, the corporation did in fact have patents issued for machines as represented, the representations would not be false, and bad faith cannot be imputed to defendants because the claims of such patents infringed prior patents, for there is a presumption that a patent, having been issued, does not infringe any known patent, and the patentee is not guilty of bad faith in accepting it, the admission of expert evidence concerning the patents held by the corporation, together with testimony as to their scope and validity, was harmless, though erroneous; the consideration of the jury being restricted only to those explanations which bore upon the mechanical features and the state of art before and at the time defendants made their representations.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 3141; Dec. Dig. ⊜1169(5).]

4. CRIMINAL LAW ⊜470—EVIDENCE—OPINION EVIDENCE.

In such case, expert testimony as to the validity of the patent held by the corporation was not admissible.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1059; Dec. Dig. ⊜470.]

5. CRIMINAL LAW ⊜763, 764(10)—TRIAL—INSTRUCTIONS—PROVINCE OF JURY.

In a prosecution for conspiring to use the mails to defraud, by sending through the mails false and fraudulent representations as to corporate stock for sale, the court charged that one of the cardinal points in the case was the intent of the defendants, that questions whether it was their intent that they could make the business of the corporation successful must necessarily be answered "No"; that if they agreed to make false and fraudulent representations for the purpose of deceiving investors and the public, their ultimate belief that they could make the business a success would not excuse the false and fraudulent representations; that, in considering the question of intent to defraud, the jury should consider the intent as presented by the particular transaction attacked, and that it mattered not how confident defendants were that they could make the business succeed, or that they could return the money without loss or with profit. Other portions of the charge stated that the question for determination was not whether the business which defendants were engaged in was a legitimate or practical one, but was whether defendants were guilty of disposing of corporate stock with a criminal or wrongful intent. *Held* that, in view of the charge as a whole, the first portion of the charge was not objectionable, on the theory that it directed the jury that the defendants did not have an intention of making a success of the business, and that they did not believe it could be made successful, but the whole question of defendants' wrongful intent was left to the jury.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1731, 1738; Dec. Dig. ⊜763, 764(10).]

6. CRIMINAL LAW ⊜763, 764(6)—TRIAL—INSTRUCTIONS—PROVINCE OF JURY.

In such case, in view of the fact that the court charged that the jury should not accept its views concerning any disputed question of fact, unless they conformed to their own understanding, that portion of the charge that, if defendants agreed to make false and fraudulent pretenses or representations and assurances for the purpose of deceiving investors and

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the public, then the intent to make the business a success, or the belief that they could make the business a success, would furnish no excuse, was not objectionable on the ground that the charge did not limit the matter to representations and pretenses, but included promises and assurances that dividends would be paid and that the corporation would be a success.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1731–1733; Dec. Dig. ☞763, 764(6).]

In Error to the District Court of the United States for the District of Oregon; Robert S. Bean, Judge.

Frank Menefee and others were convicted of violating Penal Code, § 37, by conspiring to violate section 215 by using the mails to defraud, and they bring error. Affirmed.

Defendants, plaintiffs in error here, Menefee, Todd, Campbell, and Bonnewell, were convicted for violation of section 37 of the Penal Code, as a result of charges that defendants conspired to violate section 215 of the Penal Code, which relates to the use of the United States mails to promote fraud. The United States Cashier Company was an Oregon corporation. Menefee was a director and president and general manager of the corporation. Defendant Bonnewell was the fiscal agent thereof. Defendant Todd was a sales agent for a time. Campbell was a director and vice president for a time. Between September 1, 1910, and January 31, 1914, the capital stock amounted to $1,200,000 divided into 120,000 shares, of the par value of $10 a share.

The charge is that defendants with others conspired to execute a scheme to defraud by means of using the post office, and to obtain money by false representations from a number of persons named in the indictment and from the public generally by inducing them to open negotiations with the defendants and with the United States Cashier Company, and to buy stock in the corporation, and to pay defendants therefor, the payments to be procured by false and fraudulent representations of the defendants to the investors and the public; that the conspirators were to induce the investors and the public to pay and deliver to the defendants and the corporation, in exchange for shares of stock, money, by means of false and fraudulent representations by means of printed matter to be sent through the post office to the investors and other persons, representing that the United States Cashier Company owned the patents to certain devices, a change computing machine, a bank cashier machine, a lightning change maker, a currency paying machine, and a new style adding machine, and that the Cashier Company was manufacturing the machines, and that, on account of the alleged ownership of said patents and the manufacturing business, shares in the corporation were of great commercial value, and that dividends would be paid within six months from the date of the purchase of the stock; that the Cashier Company would sell large orders for the machines; that its financial condition was excellent, and that a large amount of capital stock of the corporation offered for sale was the property of the corporation, and that the money to be obtained from the sales would be invested by the corporation in a way to increase the assets and make the stock more valuable; and that, as the assets of the corporation were greater than the liabilities, defendants were justified in raising the selling price of the shares.

The indictment negatives the truth of the representations by denying that either the corporation or the defendants owned the patents to the change computing machine, or the lightning change maker, or the currency paying machine, or the new style adding machine. There was no denial of the allegation as to the representation that the corporation owned the bank cashier machine. The indictment further alleges that the Cashier Company was not manufacturing, but that its business was to sell shares of stock, and that the defendants knew the shares were of little value, practically worthless, that no dividends would be paid, that the company was not the owner of any orders to buy shares, and that its financial condition was that of insolvency; that large numbers of shares, represented to be the property of the corporation, were shares owned by defendants, and that all of the money received on

account of sales would be appropriated by defendants, and none paid into the corporation treasury; and that defendants were not justified in raising the selling price of the stock, and that purchasers would lose on account of such transactions.

It is alleged that part of the scheme was that the defendants should publish untrue statements as to the financial condition of the corporation and that they were to sell shares to investors in many states, and that the business was to be so managed that more than 25 per cent. of all the sums of money received from investors and paid to the corporation for stock would be appropriated by the defendants to their own use and gain. The conspiracy is alleged to have been a continuing one—from September 1, 1910, until January 1, 1915. Certain overt acts are charged by the mailing of letters.

The bill of exceptions recites that the government offered evidence tending to prove the allegations of the indictment.

Martin L. Pipes, J. J. Fitzgerald, and John F. Logan, all of Portland, Or., for plaintiffs in error.

Clarence L. Reames, U. S. Atty., and John J. Beckman, Asst. U. S. Atty., both of Portland, Or.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

HUNT, Circuit Judge (after stating the facts as above). The government, upon trial, identified and offered in evidence copies of six patents and twelve applications for patents for mechanical devices, all but four of which became the property of the United States Cashier Company, and four of which were assigned to the International Money Machine Company, an Indiana corporation. It appeared that about January, 1914, defendant Menefee and the other officers and directors of the Cashier Company made an arrangement by which the Cashier Company transferred to the International Money Machine Company substantially all its assets in Oregon, and entered into a contract with the International Company and the promoters thereof by which the Cashier Company received 50 per cent. of the paid-up stock of the International Company; the object of the Cashier Company having been, apparently, to continue its business in Indiana. There was evidence tending to show that the assignments made on the applications and patents by certain persons named in the evidence were transferred to the International Money Machine Company as part of the assets of the Cashier Company. But it was shown that, when it was published in Oregon and elsewhere that the United States Cashier Company owned the patents, it only owned what is spoken of as the Potter patent, for a device pertaining to money changing. Certain other patents obtained by the Cashier Company, or transferred directly to the International Company, were issued afterwards, and a number of applications for patents for the different machines were filed and were pending in the Patent Office at Washington; some of the claims having been allowed and some rejected.

[1] The evidence went to show that the representations as to the ownership of the patents to five machines, the change computing machine, the bank cashier, the lightning change maker, currency paying machine, and new style adding machine, were published in October, November, and December, 1911. It became material to inquire whether or not the representation made by the defendants of the ownership of certain patents was a fraudulent representation. Oviatt was the pres-

ident of the Payograph Company, a corporation engaged in making what are called Payograph machines. Oviatt said that in 1909 he had met Bilyeu. Bilyeu was one of the defendants, who was indicted herein, but he was acquitted by order of the court. Oviatt testified that in 1909 he had devised the principle of a coin-paying machine, and had gone to one Glover to have him develop it for him, but that, as Glover could not take up the matter, he (Oviatt) presented the idea to Bilyeu; that Bilyeu took it under consideration, and thereafter said he would go ahead with it if he could have 40 per cent. of the results, Oviatt to have 60 per cent., Oviatt to turn over to Bilyeu his ideas, and Bilyeu to go ahead developing and to make a model. Upon inquiry by defendants' counsel, the district attorney stated that the purpose of such evidence was to show that back in 1909 Oviatt was working on a coin-paying machine and made disclosure to Bilyeu, and that the government would show that the Payograph machines were thereafter made, and that the attempted sale of a similar machine in England by the defendants was had with the knowledge of the Payograph application for patent pending there; that it would be shown that there were conversations between defendants Bilyeu and Menefee and Le Monn with Oviatt concerning transactions which would be brought down to the date when Le Monn investigated the Payograph machine and sent a certain telegram which was introduced in evidence. Defendants objected, on the ground that the Cashier Company had a patent called the Bilyeu patent, and that there was no jurisdiction to try the question of ownership of any patent as between Oviatt and Bilyeu. Defendants' counsel also made the point that, there being no negative with respect to the bank cashier patent, evidence tending to show that the patent to that particular device was not perfectly good was improperly introduced.

The court ruled that if there was a patent to the cashier machine, and the Cashier Company had it, the validity of the patent issued could not be tried or determined, but that, as there was evidence tending to show that before defendant Le Monn made a visit to the Eastern States in 1912 and learned of the Payograph device, and that it was being made, he sent certain letters to Menefee, defendant, with reference to the matter, and had advised a course afterwards adopted by the corporation, testimony of the connection of the defendants with this patent was material to show their good faith. The reference of the court to a visit by defendant Le Monn to the East in 1912 is explained by certain evidence which showed that Le Monn, when in the Eastern States, saw the particular instrument (the Payograph device) being manufactured, and, believing it was valuable and would be a competitor, wrote to Menefee not to sell any more capital stock of the Cashier Company until the private stock of the defendants Menefee, Le Monn, and Campbell in the Cashier Company first had been disposed of, and that after Le Monn's telegrams, Menefee and Campbell, defendants, caused the board of directors of the Cashier Company to withdraw all the corporation's stock from the market, and a resolution was passed authorizing Menefee, Le Monn, and Campbell to sell their own personal stock.

Counsel for the defendants urge that the representation relied upon, and which the government was attempting to prove was false and fraud-

ulent, was that the defendants' company owned a patent to the bank cashier machine; that, inasmuch as it did have such a patent, the effect of admitting the evidence was to permit the jury to find therefrom, not that the representation made as to the bank cashier was false or fraudulent, but that, being true, defendants could, nevertheless, be convicted of bad faith upon this particular charge, notwithstanding the truth of the representation. It is also contended that the court left to the jury the right to find defendants guilty upon finding that any one of the representations was false and fraudulent, because the jury were told that they might find for the defendants upon every other issue, and yet find them guilty because they knowingly procured a patent which was subject to a successful attack by Oviatt.

It is true there was no substantive issue involving the validity of the Bilyeu patent; but there was a vital question as to the honesty of the conduct of the defendants in offering for sale and selling shares of stock in the Cashier Company under representations mailed to various persons as to present and prospective value of the patent rights, the foundation value of such shares. This being true, if the defendants who made such representations were well advised when they put them forth that there was a competing patented machine on the market, or about to be marketed, and that putting the competing device into the market would, with reasonable certainty, mean substantial impairment of the value of the shares in the Cashier Company, which depended, not upon the validity, but upon the value, of the patent owned by the Cashier Company, and if, despite such knowledge, defendants continued their representations of value of their patent to investors, and proceeded to dispose of their own stock because of their belief that the competing patented device would substantially lessen the value of the Bilyeu patent and shares in the Cashier Company, we believe actions and letters showing such conduct became relevant upon the issue of good faith in the making of the representations concerning the value of the stock defendants were trying to dispose of. Nor would the omission in the indictment to negative specifically ownership of the bank cashier machine affect the relevancy or admissibility of such evidence for the purpose stated. The test is: Did it have a bearing upon any material issue presented on the trial? As already said, we believe it did.

[2] It is urged that the testimony was inadmissible, because there was no allegation in the indictment that the stock was worthless, or not worth what it was represented to be, on account of the fact that the patent which the company owned was injuriously affected in its value by a prior claim of Oviatt or any one else. The question of bad faith, however, was not dependent solely upon positive proof that there was a legally established outstanding right. There might not have been an outstanding established legal right, and still, if there were claims of inventions and priority which defendants knew of and honestly believed could be established as valid, and which they believed had enough merit in them to affect the value of the patent rights owned by defendants, such a situation would have relation to the good faith of the persons making to prospective investors representations as to the value of shares, and so would have decided bearing upon the allegations of the

indictment charging fraud and deceit in the representations made to the investing public as to the value of the devices made, or to be made, under the patents as to which defendants asserted, or had, ownership.

[3] Other assignments of error deserving special mention are based upon the ruling of the court in admitting certain testimony given by E. D. Sewell, an expert upon patents from the Patent Office at Washington, D. C. His evidence covered a wide range. He was allowed to explain the method of applying for patents and the customary practice of the Patent Office in respect to prior patents issued that might interfere or be infringed by pending patents. He explained the practice of the department, and how, if the officials of the Patent Office believe that the claim applied for would be an infringement of a prior patent, the claim would be rejected; otherwise, it would be allowed. He testified as to the references to prior patents in respect to the applications made and of the patents actually issued, as appeared in the patents and applications admitted in evidence upon the trial. In substance he said that the Cashier Company did not own a patent for any machine designed to compute change, as described in one of the advertisements put forth by defendants in 1911, nor did it own a patent to an adding machine on October 29, 1911, nor did it have an application on file for the lightning change maker machine at that time; that between January 1, 1909, and December 31, 1914, the Cashier Company did not own patents to any machines described in certain advertisements concerning which he was interrogated, namely, lightning change maker, computing machine, adding machine, and Bilyeu cashier machine, with certain attachments, but that the patent which was issued on July 6, 1915, for the lightning change maker, had been assigned to the International Money Machine Company by the United States Cashier Company.

The witness testified as to applications for patents filed by or in behalf of the Cashier Company, or assigned to that corporation, and patents issued to it and assigned to the Cashier Company from 1908 to December 31, 1914. Only two patents in favor of the Cashier Company, or afterward assigned to it, appeared: the first, called the Potter patent, issued April 28, 1908, assigned to the Cashier Company in 1912; and, later, the design patent of Bilyeu. The purpose of the Potter machine was to deliver a predetermined number of coins of a predetermined value from a series of coin tubes; the witness saying that the six claims within the Potter patent were limited in certain detailed ways with respect to organization. He testified concerning the Bilyeu patent issued December 31, 1912, for a casing for coin-handling machines. This was assigned to the United States Cashier Company, and by that company to the International Money Machine Company. He said that there were other applications and other patents issued like that to Bilyeu, and that when the assignment was made to the International Money Machine Company there were some 18 applications and patents issued to Bilyeu or to some one else and assigned to the International Company; that of these 18 applications 6 patents had been issued and 12 applications were pending.

In giving the history of applications and patents, the witness said that, in the progress of the Bilyeu cashier machine patent application,

15 patents had been cited, among them one to Lindeloff, dated February 14, 1899. Witness was asked by the government counsel to say whether or not the Lindeloff patent dominated the Bilyeu cashier patent. Defendants objected, but the court, after argument, overruled the objection, and said that, notwithstanding the fact that patent had been issued, if defendants knew that their patents would not permit them to manufacture the machines, it was a circumstance going to determine whether they were acting in good faith or not, although it did not go to the validity of the particular patents. Witness was then permitted to say that the construction shown and described in certain claims of the Bilyeu patent was within certain claims of the Lindeloff patent, and that, as the claims had been allowed in the Lindeloff patent, they dominated the construction shown in the Bilyeu cashier machine.

Witness further testified concerning the patent No. 885,136, dated February 28, 1911, on an application filed by Bilyeu and Overlin, assigned to Bilyeu, and by Bilyeu assigned to the International Money Machine Company, and said that this patent was a modification in detail of the patent to Bilyeu, No. 1,114,574; but in the opinion of the witness the claims of the Lindeloff patent dominated this patent, as they did the original patent. He said that there were 13 patents, including the Lindeloff, cited in the Bilyeu patent issued prior to the date of the Bilyeu patent, and explained in detail the purposes of several applications and the improved mechanical details of several machines. When the witness came to an explanation of the bank cashier machine and the status of the patent record (application 702,164, filed June 7, 1912), defendants again objected upon the ground that the indictment did not particularize wherein the representations charged were false and fraudulent; but the court permitted the evidence, as bearing upon the question of purpose and intent in advertising the machine, and admitted evidence concerning other applications for devices and patents. After making comparison of certain devices, witness expressed the opinion that certain claims made by one Osborne in patent issued in 1907 were basic in the art and controlled the change-computing device covered by Overlin in application of July, 1912, and assigned to the Cashier Company, and by it to the International Company. Witness said the art of mechanical coin handling was old, and pointed out mechanical differences in detail of construction.

The argument of the appellants is that the effect of the ruling of the court was to permit the jury to conclude, from the evidence of Sewell concerning patents, that the defendants, in accepting the allowances made under applications and the patents, were guilty of fraud. It is said that, wherever a claim has been allowed or a patent issued, the department at Washington necessarily decided that the claim allowed or patent issued does not conflict with the patents cited against it, and that the jury were misled by a ruling said to have been, in effect, that in the process of getting patent applications allowed and patents issued, if the department has referred to prior patents, it is an evidence of bad faith, notwithstanding the decision of the department that the application is allowable and the patent good. If we assume that the view of the law, generally, is correctly stated in substance in the objection of the defendants, and that the testimony of the witness Sewell with

relation to the patent applications was improperly admitted, it is very clear that there was no prejudice to the rights of the defendants when we examine the special instructions of the court upon the matter of infringement. The court, after reciting the charge that one of the means to be used to carry out the scheme was to represent that the Cashier Company owned patents to certain coin machines, when in truth and in fact it did not own such patents, said:

"If it was a part of the conspiracy, if a conspiracy existed, that the defendants should represent that the corporation owned patents to the machines which they proposed to manufacture, and such representations were false, and known to be so to the parties making them, and were made for the purpose of inducing and persuading persons to purchase stock, it would constitute a scheme to defraud within the statute. And you in this connection should consider any willful misrepresentation that the defendants may have made in relation to the patent situation. But if at the time these representations were made the company did in fact have patents, issued by the Patent Office of the United States, for any of the machines, the representations, so far as that particular machine was concerned, would not be false. Bad faith or fraudulent misrepresentations cannot be imputed to the defendants in respect of patents in fact issued, and owned by them, or in respect to claims that are in fact allowed, because of some alleged infringement. There is a presumption of law that, where a patent is issued by the United States Patent Office, it does not infringe any known patent, and a patentee in accepting such patent is not thereby guilty of bad faith. You are not called upon to decide in this case whether the patents issued or the claims allowed were in fact an infringement of some invention or patent, or were dominated or affected injuriously by the Osborne and Lindeloff or the Cook patents, or any previous invention, and the evidence of the witness Sewell to that effect should be disregarded. The question on this branch of the case is: Were the representations made by the defendants, if any, concerning the patent situation, false and made in bad faith, with a fraudulent intent to deceive purchasers of stock in or of the company, or were they made in good faith, with an honest belief in their verity?"

By this instruction there remained of Sewell's evidence only those explanations which bore upon the mechanical features and the state of art before and at the time the defendants made representations to investors or others who might be purchasers of the stock in the Cashier Company, and when such evidence was restricted in its bearing to the question of the intent of the defendants, we believe that it was not improperly admitted; that is to say, the jury were not to decide as a fact that the patents issued, or the claims allowed, infringed or were legally injuriously affected by other patents or inventions, but the evidence concerning the issuance of the patents, and concerning the mechanical nature of the inventions to which such other patents may have related, was competent and relevant, when considered with all the other evidence in the case, as having bearing upon the motives and conduct of the defendants in any representations that they may have made with respect to the value of the shares of stock which they were selling to investors.

[4] We agree with counsel for the defendants in their contention that the court ought not to have permitted the witness Sewell to state the prior claims dominated the patent owned by the Cashier Company or infringed other patents. In Winans v. N. Y. & Erie R. R. Co., 62 U. S. (21 How.) 88, 16 L. Ed. 68, the Supreme Court said:

"Experts may be examined to explain terms of art, and the state of the art, at any given time. They may explain to the court and jury the machines, models, or drawings exhibited. They may point out the difference or identity of the mechanical devices involved in their construction. The maxim of 'cuique in sua arte credendum' permits them to be examined to questions of art or science peculiar to their trade or profession; but professors or mechanics cannot be received to prove to the court or jury what is the proper or legal construction of any instrument of writing. A judge may obtain information from them, if he desire it, on matters which he does not clearly comprehend, but cannot be compelled to receive their opinions as matter of evidence."

But we think it would be very unreasonable to hold that the expression of opinion by Sewell construing the patents was prejudicial to the defendants, in the light of the instruction of the court. We all know how frequently it happens that an expert witness will inject his views of the law. But where the court takes the matter in hand, and tells the jury to disregard the legal views of the expert, the presumption is that the jury will understand its duty, and will accept the law given by the court, and cast aside that incorporated in the opinion of an expert witness.

[5] It is said that the court instructed so as to allow the jury to convict the defendants of conspiring to execute a scheme not within the terms of the indictment, and to take from the jury the right to determine the good faith of the defendants. To illustrate the point made by the defendants, it is necessary to set forth that part of the instructions specially complained of:

"It has been truly said in argument that one of the cardinal points in this case is the intent of the defendants. But what intent? Was it their intent that they could make the business of the United States Cashier Company a success? Was it their belief that they could make the enterprise of the United States Cashier Company successful? The answer to these questions would necessarily be 'No.' If they agreed to make false and fraudulent pretenses, representations, or promises; if they agreed to make false and fraudulent representations, and assurances—for the purpose of deceiving the investors and the public in respect to the true condition of affairs of the corporation, or the value of its stock, then the ultimate intent to make the business of the corporation a success, or the ultimate belief of the defendants that they could finally make it a success, would by no means furnish any condonation or legal excuse for the false and fraudulent representations, which they would under the circumstances agree to make in order to induce the investors and the public to pay over their money.

"In considering this question, the question of and concerning the intent to defraud, you must direct your attention to the intent presented by the particular transaction set out in the indictment. If these defendants agreed that they would put forth the false representations or promises alleged, for the purpose of deceiving and misleading investors and the public into paying over their money, then it matters not how confident they may have been that they would be able to make the business or the corporation a success, or how confident they may have been that they would be able to return the money without loss, or with profit, because the representations which they would have agreed to make would be made for the purpose of getting the money in a wrongful manner, and they could not, under such circumstances, make them rightful by pointing to some ultimate good intent."

If we take the first few clauses of this excerpt from the instructions and consider them by themselves, they appear to mislead, in that they read, not as the opinion comment upon testimony, but as a charge to the jury to find as a necessary conclusion that the intent of the de-

fendants was not that they could make a success of the business of
the Cashier Company, and not that they believed they could make a suc-
cessful enterprise of the business. But by every sound rule the clauses
which are objectionable when separated from the context should be
read and considered with the rest of the instructions, and when this is
done we do not perceive how the defendants were prejudiced; for the
court, in the clearest way, repeatedly and elaborately charged that in
order to convict, the prosecution must show that the defendants inten-
tionally conspired to defraud investors. For instance, among other
things, the court said:

"The question for your determination is not whether the business which the
defendants were engaged in promoting was a legitimate business, or was
practicable or not. If the corporation, and the defendants as officers and
agents thereof, entered in good faith upon the business, believing that the rep-
resentations made by them, or to be made, were true, and that they could and
would earn enough to justify the promised returns on the investment, they
should not be convicted, no matter how visionary you may consider their
plans. Their good or bad faith in these matters is to be determined, and their
several acts and declarations construed and interpreted, by conditions as they
existed at the time the statements and declaration were made, and as they
appeared to the defendants at that time, and not by the final result of the en-
terprise, or from present conditions. * * *
"They are not on trial for evolving or devising an improvident or imprac-
ticable scheme, even though you should find their plan to be such. Nor are
they on trial for mere errors of judgment. They are on trial for a criminal
offense, and an essential element of that offense is an evil or criminal intent,
which it is incumbent upon the government to prove to your satisfaction, be-
yond a reasonable doubt. * * * The formation of the corporation and the
sale of the stock therein is not itself criminal or wrongful, provided no de-
ception or fraud is used to induce persons to make such purchases. The de-
fendants, therefore, are not to be found guilty merely for selling or offering
for sale stock in the corporation, although it may have proven an unprofitable
investment to the purchaser, nor for mere mistakes or errors in judgment.
And there is no presumption of fraud from the fact that glittering and glow-
ing promises may have been made and not carried out, unless it shall appear
that the persons who made such promises knew at the time of making same
that they could and would not be carried out."

Considering these instructions quoted, together with others where-
in the court at the outset with precision defined the allegations of
the indictment and the purposes charged therein, it is quite plain that,
in using the particular clauses referred to, the court was but further
dwelling upon the feature of intent necessary to be found before con-
viction could be had, and was emphasizing the limitation which gov-
erned the definitions and applicability thereof by telling the jury, in
effect, that the essential ingredient of intent charged and to be proved
was not that defendants could make the business of the Cashier Com-
pany a success, not that they could make the enterprise successful, but
was the making by them of the representations to defraud charged in
the indictment. And in putting the matter interrogatively and giving
negative answers, the learned judge used a method to draw the minds
of the jurors to what was alleged by excluding specifically that which
was not alleged.

[6] The appellants also complain of that part of the charge of
the court where the jury were told that if defendants agreed to make
false and fraudulent pretenses or representations and assurances for the

purpose of deceiving the investors and the public in respect to the true condition of affairs of the corporation or the value of its stock, then the ultimate intent to make the business of the corporation a success, or the ultimate belief of the defendants that they could finally make it a success, would by no means furnish condonation or legal excuse for the false and fraudulent representations which they would under the circumstances agree to make in order to induce the investors and the public to pay over money, and of another instruction wherein the court said it was immaterial how confident defendants may have been that the business could be made a success, or that they could return money invested without loss, because the representations which they would have agreed to make would have been made for the purpose of getting money in a wrongful manner, and they could not, under the circumstances, make that rightful by pointing to some ultimate good intent. The principal argument here is that the court did not limit the instructions to representations and pretenses, but included promises and assurances, and that, therefore, the effect of the court's instruction was that, if the defendants made a promise that they would get dividends and a profit on the stock they were buying, in the ultimate belief that their promise would be fulfilled and that they would make a success, they nevertheless could be found guilty.

Of course, promises and assurances that the stock would return dividends and be profitable, in the honest belief that the promises and assurances would be fulfilled, were not wrongful. But, without further quotation, our construction of the whole charge is that the jury were explicitly told that, to convict, there must have been false and fraudulent representations and assurances with a view to deceive investors and the public with respect to the true condition of affairs of the corporation or the value of its stock, but that a conviction could be had if such false representations were made, notwithstanding that defendants might have been confident that they could make a success of the enterprise. United States v. New South Farm & Home Co. et al., 241 U. S. 64, 36 Sup. Ct. 505, 60 L. Ed. 890, decided April 24, 1916. In Durland v. United States, 161 U. S. 306, 16 Sup. Ct. 508, 40 L. Ed. 709, the Supreme Court said the significant fact under the statute is the intent and purpose. In the present case this was fairly and so repeatedly impressed upon the mind of the jury that we cannot find reasonable ground for holding that they misunderstood the issues.

The court told the jury of the presumption of innocence, and particularly charged that the jurors were the exclusive judges of all questions of fact, adding that if, at any time during the trial, the court had intimated its views concerning any disputed question of fact or the testimony of any witness, the rule was to disregard it, unless it conformed to their own understanding.

We have tried to cover the main points presented by the learned counsel for the appellants. We have given to their entire argument and brief our most careful consideration, and our conclusion is that no sufficient ground is advanced for holding that defendants did not have a fair and legal trial.

Judgment is therefore affirmed.