### NELSON v. UNITED STATES.*

(Circuit Court of Appeals, Eighth Circuit. November 22, 1926.)

No. 7213.

1. **Conspiracy ⟨⟩45—Criminal law ⟨⟩400(7)—Post office ⟨⟩49—In conspiracy and oil stock mail fraud case, certified copy of lease assignment to defendant held irrelevant and not best evidence (Criminal Code, §§ 37, 215 [Comp. St. §§ 10201, 10385]).**

In prosecution, under Criminal Code, §§ 37, 215 (Comp. St. §§ 10201, 10385), for conspiracy and use of mails to defraud by false representations, inducing investment in incorporated oil company, exclusion of certified copy of assignment of oil lease, which defendant claimed to hold for the company, held not error, being irrelevant and not best evidence.

2. **Conspiracy ⟨⟩45—Post office ⟨⟩49—In conspiracy and oil stock mail fraud case, testimony that defendant believed he had title held properly excluded (Criminal Code, §§ 37, 215 [Comp. St. §§ 10201, 10385]).**

In prosecution, under Criminal Code, §§ 37, 215 (Comp. St. §§ 10201, 10385), for conspiracy and use of mails to defraud by inducing investment in incorporated oil company, exclusion of defendant's testimony that from a particular date on he believed he had title to all property advertised as owned by company held not error.

3. **Conspiracy ⟨⟩38—Post office ⟨⟩50—In conspiracy and oil stock mail fraud case, instruction that good faith was no defense held not error (Criminal Code, §§ 37, 215 [Comp. St. §§ 10201, 10385]).**

In prosecution, under Criminal Code, §§ 37, 215 (Comp. St. §§ 10201, 10385), for conspiracy and use of mails to defraud by inducing investment in oil company, defendant's hope and belief of ultimate success held not to justify use of any means to procure money, and the giving or refusal of instructions on such theory was not error.

*Rehearing denied January 27, 1927.

4. **Conspiracy ⟨⟩43(12)—Post office ⟨⟩48(8)—Though indictment for conspiracy and oil stock mail fraud alleged intent to appropriate money, charge that use to be made of money was immaterial held proper (Criminal Code, §§ 37, 215 [Comp. St. §§ 10201, 10385]).**

In prosecution, under Criminal Code, §§ 37, 215 (Comp. St. §§ 10201, 10385), for conspiracy and use of mails to defraud by inducing investment in oil company, charge in indictment that defendant intended to appropriate money invested held surplusage, and instruction that use to be made of money was not an element of the defense was not error.

In Error to the District Court of the United States for the Western District of Arkansas; Frank A. Youmans, Judge.

John L. Nelson was convicted of conspiracy and use of mails to defraud, and he brings error. Affirmed.

James D. Head, of Texarkana, Ark., for plaintiff in error.

James D. Shaver, Sp. Asst. U. S. Atty., of Texarkana, Ark. (S. S. Langley, U. S. Atty., of Ft. Smith, Ark., on the brief), for the United States.

Before STONE and LEWIS, Circuit Judges, and SYMES, District Judge.

LEWIS, Circuit Judge. In May, 1924, an indictment was found against plaintiff in error and several other persons, charging them in six counts thereof with devising a scheme to defraud and using the post office of the United States for the purpose of executing said scheme, in violation of section 215 of the Criminal Code (Comp. St. § 10385), and in one count (the seventh) with a criminal conspiracy to so use the post office in the execution of said scheme, in violation of section 37 of the Criminal Code (Comp. St. § 10201). Plaintiff in error was put to trial and convicted on the conspiracy count and on four of the other counts, and he then brought the case here. The scheme charged to have been devised is set forth at length in the first count and by reference made a part of the other counts. Each of the six counts set forth a letter charged to have been deposited in the United States post office at El Dorado, Arkansas, for the purpose of executing said scheme. The conspiracy count charges that 21 named overt acts were done by some or all of the defendants to effect the object of the unlawful conspiracy. The scheme in substance was to obtain money and property from numerous unknown persons by means of false and fraudulent pretenses, representations and promises, and speaking in general terms it was this:

Plaintiff in error and two other named defendants would and did organize and make themselves the officers of Nelson Petroleum Company, a corporation, with a capitalization of $350,000, divided into 70,000 shares. They would also organize the Nelson Refining Company, a trust estate, with a capitalization of $750,000, divided into 150,000 shares, and the defendants would and did thereupon make certain false and fraudulent statements and representations in newspaper advertisements and circular letters to be sent through the mails concerning said companies for the purpose of inducing the public to purchase shares of stock in said corporation and in said trust estate; that the place of business and the principal office of each of said companies was to be at El Dorado, Arkansas; that the pretended purpose of each of said companies was to engage in the production and refining of oil for profit; that a part of said scheme was to take and hold title to properties and oil leases in the name of the defendant John L. Nelson personally, without transferring same to the companies to which they might belong, so as to hide and conceal the production and proceeds therefrom from the persons to be defrauded; that a part of said scheme was to announce a pretended 50 per cent. cash dividend to all stockholders in the Petroleum Company of record March 31, 1923, and to advertise that fact in order to stimulate and assist in the sale and purchase of shares; it was further a part of said scheme to withhold checks for said pretended 50 per cent. cash dividend and not send them out promptly nor until after the organization of the Nelson Refining Company, and then induce stockholders to use the dividend checks with additional funds in purchasing stock in the Nelson Refining Company, thus inducing the stockholders in the Petroleum Company to make additional and unprofitable investments, and to never deliver and never pay checks for dividends to other stockholders. Other elements of the scheme were alleged to be false and fraudulent pretenses, representations and promises that the Nelson Petroleum Company was laid on a foundation of dividend-paying oil production, that it had producing wells which would guarantee a return to stockholders of 100 per cent. on their investments and was earning dividends for its stockholders, that subscription orders were pouring in for stock at $5 per share and that on a day named in the future the price would be advanced to $7.50 per share and in all probability it would advance to $15 or $20 a share on the completion of another well and that persons would be lucky if they could purchase stock immediately.

The circular letters and advertisements, which were put out beginning in January or February, 1923, brought in through the mails within two or three months about $150,000 from the general public for stock in the Nelson Petroleum Company. Nelson had been engaged in drilling oil wells in the oil field near El Dorado, Arkansas, during 1922, and had met with some success. He had brought in some oil wells for others and had obtained some leases for himself on which he found oil, and in the late fall of that year he conceived the idea of organizing these companies. With the assistance of some of his codefendants who were in his employ he incorporated the Nelson Petroleum Company in February, 1923, and a month or so later they executed a declaration of trust, calling it the Nelson Refining Company. It can hardly be said that the Nelson Petroleum Company was organized. Articles of incorporation were executed and filed. Nelson claimed that he turned over to it on its incorporation three or four oil-drilling rigs, but that he retained title to all leases and other property in his own name, which he intended the corporation should have, and held them for the corporation and continued to carry on the business in his own name as before. There was some evidence that on filing the articles an informal meeting was had at the office of Nelson's attorney and officers of the corporation, including Nelson as president, were agreed on, and that the attorney drew up a statement as to the property which Nelson was to continue to hold for the corporation. He testified also that he thought he made assignments or deeds, but no such instruments were ever recorded nor could they be found. No records of corporate proceedings were kept or written up. None were had. A stock certificate book was procured and when subscriptions came in the certificates were issued and sent out and the amounts received therefor deposited in bank to the credit of the corporation. Any moneys received by Nelson in connection with operating the properties were put into the company's bank account and the named officers of the company checked against that account as Nelson might give directions. He was in entire control. The declaration of trust of the Nelson Refining Company was never filed for record. Some of its stock was sold to the public. Creditors began proceedings in bankruptcy against the Nelson Petroleum Company early in July, 1923. It was adjudicated bankrupt in September following and was insolvent. In that month Nelson was adjudicated bankrupt. He was insolvent. The Refining Company had no assets. That was also true of the Petroleum Company, aside from

the three or four oil-well rigs which Nelson testified he had assigned to that company. The reason he gave for retaining in his own name property which he said belonged to the Petroleum Company was that he wanted to maintain his credit and that the company had no credit. He was in debt about $60,000 at the time the Petroleum Company was incorporated, and he testified that it was understood by the company's directors that it would assume and it did assume $30,000 of that indebtedness. He furnished between $12,000 and $15,000 to pay for the stock-selling campaign of Petroleum Company stock, and allowed to brokers at Chicago, who sold some of that stock, 30 per cent. of the amount for which it was sold. The same rate of compensation was paid to brokers who sold some of the Refining Company stock. No corporation record was made up of the 50 per cent. cash dividend to stockholders in the Petroleum Company, but Nelson testified that the directors of that company agreed that that dividend should be declared. Some of it was paid but much of it was not paid. The company did not have the funds. It was advertised as payable to stockholders of record March 31, 1923, and the evidence is strongly persuasive that the whole purpose of declaring and advertising that dividend was to stimulate sale of stock in the Refining Company. Nelson so testified. Some of the money received for stock in that company was turned over to the Petroleum Company and its stock issued to the Refining Company. When it was found that money could not be obtained to pay the 50 per cent. dividend, deferred notes were issued to many of the Petroleum Company stockholders for their share of the dividend, and these were never paid. Some stockholders were induced when they received the 50 per cent. dividend check to use it and more money to buy stock in the Petroleum or Refining Company.

At the argument the indictment was conceded to be good, and it was not denied that the proof in the case supported the verdicts of guilty.

Thirty-four errors are relied on, of which four relate to the exclusion of evidence, four challenge portions of the court's charge, one the failure of the court to declare a proposition of law though not requested, and twenty-five are based on refusals to instruct the jury as requested.

[1] 1. Three assignments on exclusion of evidence relate to what is designated as the K. M. A. lease, which appears to be an oil lease on lands in Texas. Nelson offered to show

that he had a half-interest in that lease, that it was of value and that he held that interest also for the Nelson Petroleum Company as its property and had included that with other oil interest in a written statement which he thought he had signed for the benefit of the company, to be held by him for it. That is, he claimed that he held this lease in the same way that he held the leases in the Arkansas field for the company. To establish this counsel said:

"We offer now in evidence certified copy of an assignment of lease from A. D. Hudspeth et al., as trustees of Canadian Petroleum Co., to J. L. Nelson, as Defendant's Exhibit 22."

On objection the exhibit was excluded. We do not find the exhibit in the record. The court expressed the opinion that the original was the best evidence. The original assignment was not offered. We think there was no error in this ruling. Furthermore, there may have been other objections apparent on the inspection of the certified copy which would have required its exclusion. The offer shows that the claimed assignors were trustees. The extent of their powers is not disclosed. Again it is not shown that if Nelson had the interest claimed he had ever conveyed it to the Nelson Petroleum Company. In view of the charges in the indictment we fail to see the relevancy of the offer.

[2] It is also assigned and relied on as error that: "The court erred in refusing to allow the witness Nelson to testify that from the 15th day of April, 1921, until his bankruptcy he believed that he had title in his own name to all the property advertised as being owned by the company."

We are not cited to the page of the record where this ruling can be found; we cannot see how it is at all relevant as to what Nelson owned or thought he owned prior to the incorporation in February, 1923, nor do we understand how his statement as to his belief can be of any significance or be given any weight in face of the fact, disclosed by his own positive testimony, that he continued to personally hold title to all of this property, mortgaged it and dealt with it as his own up to the time he was adjudged a bankrupt.

[3] 2. The other thirty claimed errors relied on all have reference to instructions, those given by the court and those which it refused to give. We think they may be disposed of without a special consideration of each; in fact, to do the latter would extend this opinion to an unreasonable length. At the close of the charge given by the court counsel for

defendant presented thirty-six separate instructions and requested the court to give them to the jury.

Nelson as a witness in his own behalf testified at length to what he did and to what he hoped and expected from the oil leases in the way of profits. He said he went to his attorney in November or December, 1922, about forming a corporation, that he supposed it had all been attended to and went back to his attorney in January or February to get the incorporation papers and was told that the company had not been incorporated, that the articles of association must be first signed up and that thereupon he took two other parties with him and they signed the articles of incorporation; that at that time or about that time he had his counsel prepare a list of the properties that he intended to convey to the corporation; such a list was offered in evidence and received; he testified that he thought he had made a deed of these properties to the corporation but that it was not put of record and he did not intend to put it of record. No such deed could be found. The title papers to the properties embraced in the list were admitted as evidence. The list offered as an exhibit contained, among other named leases, the one known as K. M. A., in Wichita County, Texas, and 1/64th royalty interest in 160 acres at Chickasha, Oklahoma. His counsel asked him this question about the exhibit:

"Q. Mr. Nelson, from the time that you claimed to have custody of this Exhibit No. 1, which purports to be a tentative contract of conveyance, you may state from that time on you honestly believed the title to this property was in the Nelson Petroleum Company.

"A. I did."

The exhibit was offered in evidence. He borrowed money in his own name after the company was incorporated and mortgaged some of the interests which he held to secure the debt. He testified that he actually believed the statements that were made about the value of the properties and that they would earn dividends, that he acted conscientiously in organizing the company and intended to put into it everything he had, that he did not appropriate any of it to his own use, that he thought both companies would grow and he could not see how they could fail. He knew it was advertised all the time as the property of the Nelson Petroleum Company and he carried it in his name in good faith for that company. He was not restricted in giving every detail and in making every explanation, both as to what he did, his reason therefor,

his good intentions and his good faith expectations for the future.

The court expressed no opinion as to the weight of the evidence and made no comments on the facts of the case. The charges in the indictment were stated and carefully explained to the jury. The difference and the legal effect between expression of an opinion and a statement of fact was stated to the jury and they were instructed to make discrimination between the two. The jury were further advised, in substance, that defendant was not criminally liable for an honest belief, that his liability depended upon whether he had made certain statements of facts as alleged in the indictment and whether those statements were false and the defendant knew them to be false, and if so whether he made them with the intention of thereby procuring money or property as charged. Among the many exceptions taken to the charge at its close by Nelson's counsel was this:

"If the court please, I desire to ask the court in connection with the instruction given in regard to ownership of the 16 producing wells, that if Nelson in good faith held those oil wells in trust for the Petroleum Company at the time of the alleged representation, and at the time of the alleged promises, then that his trusteeship and holding them in that way would in effect be the same as the ownership by the company.

"The Court: The jury will take the testimony upon that point and determine what purpose defendant had in holding the title to the property, and whether or not it was in good faith, or whether or not it was done for the purpose of holding out that the company actually owned the property while in truth and in fact the title was retained by Nelson for any purpose that he may have had.

"Mr. Head: I still object to it because the court said 'for any purpose that he may have had.' I think that ought to be any sinister purpose, because if he held it for the innocent purpose of helping out with credit that he had, and the absence of credit by the company, that would be in fact the ownership.

"The Court: With reference to the matter of credit the jury will take into consideration the testimony of Mr. Nelson with reference to the purposes that he had in holding the title. As I recall the testimony of Mr. Nelson upon that point it was in substance that the company had no credit. You will determine whether or not it was sufficient explanation, and you may ask yourselves the question whether or not if the company had title to the property, the same property that

Mr. Nelson had title to, if they would not have as much credit as he had, based upon that particular property."

Counsel in further excepting to the court's charge said:

"Mr. Head: Now, with reference to that portion of the charge wherein the court was distinguishing between statement of opinion and statements of fact, I want to except to it because it fails to carry to the jury the proposition that a statement may be worded in a way which does not express on its face that it is an opinion, and yet in fact be nothing more than an opinion.

"The Court: That is a question of fact that the jury will determine. That is a refinement that I cannot conceive of."

The insistence of Nelson's counsel throughout the trial, and here, on the effect which he insists should be given to Nelson's claimed good faith and honest expectations cannot be acceded to. The Seventh Circuit, in Moore v. United States, 2 F.(2d) 839, was confronted with the same contention. It was there claimed that the defendant's hope and belief of ultimate success justified the employment of any and all means and the promulgation of any plan or artifice to secure money for the enterprise. The court answered the contention by quotation from its opinion in Linn v. United States, 234 F. 543, 148 C. C. A. 309:

"The insistence that Linn honestly believed this property had great possibilities, and that, if he could get hold of it and work it, large profits would speedily come to himself and to those whom he might induce to purchase shares of the stock, may be conceded. But when, in order to raise money, he devises a scheme to represent to intending stock purchasers that his company had present title, possession, control, and operation of property, and a vast offer for it, when all this, to his certain knowledge, was false, then these constitute the scheme or artifice to defraud these intending purchasers into making purchases they would not otherwise make, and is to be considered wholly apart from the faith which Linn might have, that if, in this manner, he might raise sufficient funds, he would then get hold of the property, and make vast profits for these same intended investors."

See Agnew v. United States, 165 U. S. 36, 53, 17 S. Ct. 235, 41 L. Ed. 624; Menefee v. United States, 236 F. 826, 837, 150 C. C. A. 88.

The truth is, Nelson made no defense other than the one discredited in the foregoing quotation. The representations charged to have been made were representations of facts, they were false, and they were effective for the purposes intended. Neither company ever had anything in the way of property, aside from the funds sent to Nelson and his associates for the purchase of stock; and Nelson's explanation of the so-called declaration of a 50 per cent. cash dividend confirms the charge of the indictment of the purpose for which that was done,—a mere pretense to induce the purchase by the unsuspecting public of more stock. The entire record has been read and we are convinced that every principle of law applicable to the facts of the case was stated to the jury for its guidance. The requested instructions asked for an amplification of some of those principles and for statements of the effect of defendant's asserted good faith and honest expectations as applied to different facts in the case, and in a way that counsel doubtless thought would more favorably impress the jury in behalf of defendant. In our opinion the court did not err in refusing to give them.

[4] 3. The indictment charged that the pretended purpose of the Petroleum Company and the Refining Company, as represented by defendant, was to engage in the production of oil and gas and refining crude oil for profit, but that in truth the real purpose of defendant was to sell shares or certificates in both companies and then appropriate to his own use and benefit moneys so received. The court in its charge to the jury stated:

"The use that was made of the money that was received by the sale of the stock of these two companies, that is not an element of this offense, but the jury may consider that in connection with all the other facts in the case to ascertain what was the purpose of obtaining the money."

Exception was taken to this part of the charge. It is argued that it was the function of the grand jury to ascertain and state the claimed fraudulent scheme, and that having done so, and having made the intention of defendant to appropriate money received from the sale of stock a part of said fraudulent scheme, the court was without right or power to change or modify the scheme set up in the indictment; and that it erred in eliminating from consideration of the jury the alleged intention of defendant to convert the money so received to his own use and benefit. The gist of the offense charged was a use of the post office for fraudulent purposes. If the charge in the indictment in the respect noted was not a material element in the fraudulent scheme, then it was the duty of the court to instruct the jury to disregard it and there was no error. We held in Chew v. United

States, 9 F.(2d) 348, 352, that whether defendant gained or lost by the scheme is immaterial and need not be alleged. The question as to what is surplusage in an indictment and may be disregarded has been so clearly and fully considered and discussed by this court in Mathews v. United States, 15 F.(2d) 139, opinion filed October 4, 1926, that we deem it unnecessary to attempt to add anything to what is there said. It is sufficient to say that the allegation was an immaterial one.

Other errors are relied on. We think they are obviously without merit.

The judgment is affirmed.