**FOSHAY v. UNITED STATES.***

**HENLEY v. SAME.**

Nos. 9708, 9709.

Circuit Court of Appeals, Eighth Circuit.

Nov. 13, 1933.

Rehearing Denied Jan. 15, 1934.

*Writ of certiorari denied 54 S. Ct. 531, 78 L. Ed. —.

H. H. Henley, for appellants.

Fred Horowitz, Sp. Asst. to Atty. Gen. (Lewis L. Drill, U. S. Atty., of St. Paul, Minn., on the brief), for the United States.

Before STONE, KENYON (deceased), and WOODROUGH, Circuit Judges.

WOODROUGH, Circuit Judge.

Wilbur B. Foshay and Henry H. Henley were convicted on counts 1, 3, 4, and 5 of an indictment in 17 counts, charging them and five others, with having devised a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, and with having used the mail in violation of section 215 of the Criminal Code (18 USCA § 338). They were each sentenced on said counts to fine and fifteen years' imprisonment. They appeal.

The indictment, excluding some formal parts, is appended.

The appellants associated themselves in business in 1921, Foshay then being about 39 years old and Henley of the age of about 36, both having worked their way up from humble beginnings and acquired experience in various lines of the utility business. Since 1921 and up to November 1, 1929, when their enterprises went into receivership, they have carried on the business of acquiring public utility and other properties and bringing them under unified management and control; raising the money by sales of corporate stocks and securities to the general public and to financial institutions, the scale of their operations constantly expanding. All of their business was corporate in form—a great number of corporations figuring in the record from first to last—but at all times they kept control of the corporations and the enterprises by retaining command of the voting corporate stock. They had a holding or parent company, bearing the name of Foshay, and subsidiaries, and there were companies subsidiary to the subsidiaries, but all ultimate management and control remained with Foshay and Henley. The scale of their stock selling operations is indicated in a summary of their security sales between the year 1921 and the year 1929, reflecting a total of such sales in those years amounting to $63,894,521, and a somewhat sketchy outlining of their affairs may be quoted from an advertisement published by them early in 1929.

"The business of W. B. Foshay Co. was founded in 1917 in a small office in the First National-Soo Line Building in Minneapolis,

and has enjoyed a continuous and steady growth until its interests are nation-wide and international in scope. Beginning with only one employee, the Company and its affiliated organizations now employ over 2,100 people in various localities throughout North and Central America. Three major groups of utilities, with a combined valuation of over $50,000,000.00 have been consolidated and built up under Foshay management since the establishment of the business. * * * W. B. Foshay Company is a proprietory and management company, specializing in the management of public utility and selected industrial enterprises, doing the engineering, accounting and construction work of such companies, and distributing securities for the advancement of such companies to its customers through a national sales organization with offices in more than twenty-five cities from coast to coast. Other interests and activities include the control of three city banks, Public Utilities Consolidated Corporation, Foshay Building Corporation, which owns the 32-story Foshay Tower, unlike any other office building in the world, the Leamington Hotel, an exclusive apartment and residential hotel in Minneapolis, and Tower Press, Inc., through which is obtained more economically the large quantity of printing required by the Foshay organization and its associate companies, as well as miscellaneous investments in public utilities and industrials. Public utilities now under Foshay Management are located in twelve states, two Canadian provinces, Mexico, Nicaragua, Honduras, and Alaska. * * * Thus, Foshay interests have geographical, economic and political diversity. * * * Headquarters of the business are in Minneapolis in the 32-story Foshay Tower. Executive offices are also maintained in Chicago, New York and in the Foshay Building, San Francisco. The Foshay Building in San Francisco houses headquarters of the Pacific Coast Division of the Investment Department, San Francisco Security Sales Office, Western Utility Acquisition Manager, and also quarters the executive operating personnel of the western properties of Public Utilities Consolidated Corporation and subsidiaries. Branch offices are located in New York, Boston, Chicago, San Francisco, Denver, Des Moines, Saint Paul, Hartford, Manchester, N. H., Portland, Maine, Los Angeles, San Diego, Stockton, San Jose, Sacramento, Santa Barbara, Portland, Oregon, Seattle, Spokane, Houston, Oklahoma City, Tulsa, Fort Worth, Dallas, and Wichita. This nation-wide contact keeps the management in touch with the pulse of the entire country and gives a breadth of viewpoint which is an invaluable aid in serving its customers and continuing its successful growth. * * * The management of the W. B. Foshay Co. is in the hands of those executives responsible for the continued successful growth of the business, assisted by a highly skilled staff of experts. The management has followed a policy of active but constructive expansion along conservative lines with noteworthy success and with a steady increase and improvement of its facilities. * * * W. B. Foshay Co. has an uninterrupted dividend record from the inception of the business over eleven years ago. Cash dividends aggregating over $811,-000.00 (afterwards increased to $969,626.72) have been paid to stockholders of W. B. Foshay Co. since the inception of the business. * * * The story of Foshay Management is best told by the slogan: 'For over eleven years—All your money—All the time—On time.'" At the time of the receivership the stocks and securities were scattered in the hands of thousands of investors totaling many millions of dollars.

The trial court epitomized the accusation of the indictment in its instructions to the jury as follows: "The heart of the fraudulent scheme charged is that the defendants schemed to and did falsely represent that, owing to the good management of the Foshay companies, they were earning and paying large dividends upon the stock of such corporations and that the stock furnished a safe and conservative investment; whereas, in fact, the stock did not furnish a safe and conservative investment, and that the companies were not earning dividends as represented, and were not earning any dividends, but were paying said dividends out of capital of the corporations for the purpose of inducing potential investors to purchase such stock."

Undoubtedly, the representation that a corporation is being so successfully managed that it is earning and paying, and will continue to earn and pay, dividends is the most effective of all inducements to buy its securities. Sentiment rarely controls and people buy shares in corporations in order to share in the earnings being made and to be made, and these appellants always made the representation that the Foshay Companies had had and would continue to have large net earnings and so were paying, had paid, and would continue to pay large dividends on their stock. The charge in the indictment that the companies were not earning the dividends and that these monthly dividends were not really from earnings but that they were taken out of capital

went, as the trial court stated, to the heart of the case.

Typical representations made by the appellants are as follows: "Net earnings of the business for the last five years, 1924 to 1928 inclusive, have averaged 23.62% upon the average surplus and capital investment during each respective year." "Net earnings for the year ending December 31, 1928, after depreciation, federal income taxes and all charges, were $432,427.64, or $16.61 a share on the preferred shares outstanding at December 31, 1928." " * * * W. B. Foshay Co. offers the following real superiorities: Income from operating earnings, not profits from capital speculation." "Every month the company sends to all stockholders an earning statement which shows you the current earnings of the company." "The W. B. Foshay Co. earnings accrue from its own interests and its own properties—income from public service and industry as distinguished from profit from trading and speculation." "Based on the figures as shown under 'earnings' on page 3 it will be seen that the 7% dividend on the preferred shares (of PUCC) was earned approximately 2.2 times, and the dividends on the Class A Common shares nearly 3 times." "Earnings as above were 2.1 times dividend requirements on preferred shares, and 2.22 times dividend requirements on Class A common shares." " * * * Dividends on the preferred shares (PUCC) were earned 2.35 times."

We have taken these few illustrative representations concerning the net earnings of the companies from the great volume of advertising literature put out under the direction of the appellants and now before us in the record. They promoted the sale of their various securities to all classes of people by a constant campaign of advertising, personal solicitation of salesmen, circular letters, pamphlets, newspaper and magazine advertisements, and also regularly published a house organ called the "Spot Light" and another one called "Net Yield," in all of which the typical representations quoted were greatly stressed and amplified. The endless outpouring of stock selling propaganda was intended to and did make the impression upon readers that the Foshay companies were continuously making money hand over fist and applying a fraction only of the money they made to dividends.

Furthermore, the record is clear that up to a time very shortly before the receivership, all of the companies whose securities the appellants caused to be sold to the public did pay dividends—paid them monthly—inclosing with the dividend checks the reiterated representations about the earnings of the companies. It is also apparent from the record that this practice of paying monthly dividends and the belief inculcated into the public that the companies were making money and paying dividends from their earnings, were the main factors that made possible the selling of such vast amounts of securities by these appellants. People bought them because they believed, as they were told, that the companies were making money currently and continuously and that the companies had great net earnings in the ordinary sense of "excess of gross earnings over the expenditures defrayed in producing them," as the Supreme Court expressed it in Union Pac. R. Co. v. United States, 99 U. S. 402, 25 L. Ed. 274.

The true facts upon this phase of the prosecution are perfectly clear. The books of account of the companies are in the hands of the receivers and the appellants are shown to be responsible for them, the controlling bookkeeping set-ups and important probative entries conforming to their orders and directions. The books admittedly reflect truly what the costs of running the business were and what moneys were taken in from the operations of utilities and other properties by the companies.

The appellants also took the witness stand on their own behalf and testified through many days of examination and cross-examination.

Upon their own admissions, as clearly as upon the record of the books of the companies, it is demonstrated that during the period of time to which the testimony to support the accusations is mainly directed, namely, the three years before filing of the indictment in January, 1930, the Foshay Companies did not have net earnings for the payment of dividends in the ordinary acceptance of the words. They had vast amounts of money coming in through the sale of stocks and bonds and loans, and so they were enabled to, and did with that cash money, pay dividends and interest charges, and even on occasions extortionate usury upon their borrowings, but they were not making any money in the way of net earnings. The gross earnings were always less than the expenditure incurred in producing them.

As to the parent company (Foshay of Minnesota): In 1927 it was forced to sell its then principal subsidiary, People's Light & Power Corporation, at a loss of more than

one and a half million dollars. In 1928 appellants organized the W. B. Foshay Company of Delaware and transferred all of the assets of the Minnesota corporation to that company. In that year there was an actual deficit on the books, when the unrealized items that reflected nothing coming in to the company are excluded, amounting to nearly a million dollars, and as of October 31, 1929, the deficit arrived at in the same way was far above a million.

The principal subsidiary called PUCC Arizona was organized in July, 1927, and could not have made any substantial income on its capital from its properties because for at least a third of its capital stock issued and sold, it had received nothing whatever at the time of receivership and its books show that it made no money. (The other company called PUCC Delaware was not extensively used by appellants and may be disregarded.)

The demonstration was beyond a reasonable doubt that although the public and financial institutions bought the Foshay stocks and securities in the belief instilled into them by the appellants that the companies were earning net money for dividends, and that the dividends being paid were taken from such net earnings and were only a part thereof, the real fact was that the operations of the companies never produced any money above the cost of operations and charges and the cash for dividends was necessarily taken out of the security sales and loans.

The theory of the defense on this issue was that the capital assets of the companies were going up in value and so from time to time the appellants would cause higher values to be put on the assets by entries in their bookkeeping set-up. Mr. Foshay, in one of his letters, referred to such a raising of an asset figure on the books as a write-up, and the expressive word was carried throughout the trial. By means of such write-ups and other mere bookkeeping entries that were equivalent in effect, made when the book balances were turning towards the red, the books were always made to show great surpluses. Both appellants affected to believe that such surpluses, so arrived at on the books of account, were earnings, or "net earnings of the companies," and at any rate, they were the "earnings" that they meant in their advertisements. Without the write-ups it was admitted that there would have been no surpluses shown on the books of account. Mr. Henley testified for the defendants: "If you eliminate the write-ups you would have a deficit, certainly." And he also testified: "I want you to understand that a write-up or appreciation is an earning of the company if it is honest, that is what I mean. If it is honest, I think it is, you bet." It is significant that throughout the tons of company literature no word can be found to inform the public that the "earnings" were simply increases of valuations that Foshay and Henley were determining in their own minds and writing up on the books. Mr. Henley testified: "At no time was any letter sent to the owners of preferred stock or any advertisement caused to be published in which we stated that the company had a policy and practice of putting appreciations or write-ups on the books of the company—certainly not." And in response to the direct question: "And I will ask you further, have you ever at any time in any advertisements that went to the general public, or to any of the general investors of the Foshay Company, indicated that when you said that the company had earnings, that you did not mean earnings that you earned by write-ups?" Answer: "How could we tell them anything different when we considered and thought that they were earnings, and still believe so." A completely revealing declaration was made by this witness as follows: "Generally speaking, with respect to write-ups, I did believe that it was proper to put that increased value into the income account and pay dividends out of it, because of the fact that practically the Foshay Company's *entire revenue and its business was in creating values, * * * its main business was the business of creating values.*" This declaration that "the Foshay Company's entire revenue and its business was in creating values" is undoubtedly, as shown by the whole record, the real key to the Napoleonic adventure of Foshay and Henley. They found out they could sell stocks and securities of utility companies if people believed the utilities were making large current incomes on the invested capital. There was general faith in the power of such monopolies once established on that basis to go on making money. While that faith was at the peak, it obviously involved some difficulty to go on the market and buy utilities from the owners at such prices that there would be immediate large returns to the buyer on the cost of acquiring the property, plus the great cost of getting the money to buy it with. Foshay and Henley solved the difficulty by their theory of "creating values." When they acquired a property and included it "in their picture" (as their phrase was), a value was "created." They determined for themselves how much the

creation amounted to in dollars and cents and wrote it up on their books where it was carried into surplus. By calling such surplus "earnings" as they did, the way was clear and sixty millions of other people's money were brought into their control.

It is conceivable that appellants could have gotten stock subscribers to back them in their great adventure of creating values in utility and other properties if they had told the truth about it, and if they had let it be known that the gains on the money invested were going to be reflected in the increased value of the assets that would be acquired, and that the "entire revenue" would be in the increased values. But these appellants took no such chance. They deliberately and intentionally, and with many crafty bookkeeping devices, covered up and concealed the real nature of their adventure; and falsely pretended that they were making money, earnings, net earnings, operating earnings, profits, and income. People bought Foshay securities because they believed the companies were making money and paying large dividends monthly out of the earnings. They believed it because the appellants told them so. Appellants' pretense that their alleged creating values was the same thing and their attempt to so justify their representation was simply a shift from the question of their honesty to the question of their intelligence. On which shift, they got the full benefit of the court's instruction about mistakes and errors not being criminal, hereafter quoted.

On this main gist of the case the proof of the appellants' deceit by which thousands of persons were induced to give up millions of dollars amounts to demonstration. For years these appellants succeeded in deceiving these thousands of people into the belief that the Foshay companies were making money in the way of net earnings. It was done by bald, outright prevarication. Such a course of conduct comes clearly within the statute.

The law is settled that no amount of honest belief that the enterprises would ultimately make money for the stockholders can excuse or justify false representations sent through the mails to obtain money for the enterprise. Busch v. United States (C. C. A.) 52 F.(2d) 79; Linn v. United States, 234 F. 543 (C. C. A.); Menefee v. United States, 236 F. 826 (C. C. A.); Pandolfo v. United States, 286 F. 8 (C. C. A.); Moore v. United States (C. C. A.) 2 F.(2d) 839; Nelson v. United States, 16 F.(2d) 71 (C. C. A. 8).

The court said in Corliss v. United States (C. C. A.) 7 F.(2d) 455, 457, that a representation by a company agent that his company had paid dividends and, in his opinion, would continue to do so "fairly implied that the dividends were paid out of net profits," and "if defendants had been actuated by any corrupt purpose [in making the statement falsely], their guilt would be plain."

In a recent conspicuous case in England, the conviction of a company director was sustained, although his published prospectus did not contain any outright statement of fact found to be false. The statute denounced the publishing of any written statement known to be false in any material particular with intent to induce any person to become a shareholder. The prospectus reflected the payment of dividends over a period and although the dividends were in fact paid as indicated in the prospectus, they had been paid out of reserves accumulated in former years. The court held the jury justified in finding that the failure to disclose the source of the dividends amounted to concealment, on account of which the prospectus statement as a whole, was deceptive and false in a material particular. Rex v. Kylsant, 101 K. B. Div., 1932 L. J.

Under our section 215 denouncing every scheme to defraud or to obtain money by means of false pretenses, any false, deceptive, deluding pretense put forth through the mails to get other people's money is an offense. Durland v. United States, 161 U. S. 306, 16 S. Ct. 508, 40 L. Ed. 709; United States v. Jones, 10 F. 469 (C. C.); United States v. Loring (D. C.) 91 F. 881; Horman v. United States, 116 F. 350 (C. C. A. 6); Brooks v. United States, 146 F. 223 (C. C. A. 8); Foster v. United States, 178 F. 165 (C. C. A. 6); McCarthy v. United States, 187 F. 117 (C. C. A. 2); Harrison v. United States, 200 F. 662 (C. C. A. 6); United States v. Goldman, 207 F. 1002 (D. C. Ohio); Oesting v. United States, 234 F. 304 (C. C. A. 9); New v. United States, 245 F. 710 (C. C. A. 9); Gouled v. United States, 273 F. 506 (C. C. A. 2); Brewer v. United States, 290 F. 807 (C. C. A. 2). Upon the gist of this case there is no occasion to consider the subtleties often involved in frauds. Here there was simply the brazen, false pretense of continued success in making money, net earnings, and dividends, put forth concerning companies whose charges and outlays constantly exceeded the income, and which had to use the moneys derived from stock subscriptions, security sales, and loans at usury to pay the dividends and charges.

It is well settled that the criteria of fraud

evolved in civil cases are applicable to prosecutions under the mail fraud statute. Discussion of what amounts to fraud is found in greater volume in the reports of civil cases, but the principles are no different. To try to delimit "fraud" by definition would tend to reward subtle and ingenious circumvention and is not done. The particular facts determine its presence or absence on principles long settled by the courts in civil and criminal cases alike. Where company officers intentionally mislead prospective investors into the mistaken belief that their company is making money, by the false representation that it is currently in receipt of large net earnings, exceeding the current dividends when, in fact, there is not enough of current earnings to meet the expenses, an offense is presented under the statute (section 215) as soon as the mails are used. United States v. Rowe (C. C. A.) 56 F.(2d) 747.

█ Another broad phase of the case arises out of representations referred to in the subdivision numbered (4) of the indictment made about Foshay's Arizona subsidiary corporation and the securities thereof which were sold through the appellants in the name of the Foshay Company. In the last years before the receivership the main subsidiary of the Foshay Company was the Public Utilities Consolidated Corporation, an Arizona corporation, called PUCC, and appellants caused about $20,000,000 of this company's securities to be marketed during the two years and three months of its active existence. As in the case of the other securities caused to be sold by appellants, the basic factor that made the selling possible was the public's understanding and belief, inculcated by appellants, that this company was making money; that is, that it had large net earnings for the payment of the dividends which it disbursed every month. The appellants so represented and the representation was utterly false. The undisputed fact is proven to be that as to more than $5,-000,000 of its securities sold, the company had received nothing whatever at the time of receivership, and the receipts from its operations were almost negligible in comparison with the enormous capital investment and expenditures.

But, in addition to this general false representation, the appellants represented to financial institutions and the public that the laws of Arizona and the power of supervision vested by those laws in the Arizona corporation commission, assured that the issuance of the securities of this company would be proper and that the corporation would receive full value therefor. It was explained to the public by appellants that under Arizona laws no securities could be issued by this company until such issuance was passed upon and approved by the Arizona commission and that the commission would not permit security issues except upon full value going to the company.

The indictment charges that appellants' representations concerning assurance of safety to security holders in this company on account of the Arizona laws and the supervision of the Arizona commission were false and that neither the laws nor the powers of the commission afforded any such assurance of safety, and that, as a matter of fact, when and as the subsidiary issued its securities it turned them over to the Foshay holding company in Minneapolis and it so turned over to the Foshay Company its securities in the amount of more than $5,000,000 for which the subsidiary company received nothing.

In the gist of it, this accusation of the indictment concerning this particular misrepresentation as to the safety assured by the Arizona laws and commission presents a charge of the same kind as the other charges. It is simply another representation alleged to be false and counted on in addition to the other misrepresentations in the general scheme to defraud and to obtain money by false representations. As typical of this representation, the following may be quoted from publications of the appellants: "Public Utilities Consolidated Corporation is under the supervision of the Arizona Corporation Commission and the issuance of all securities of the Corporation, as well as the expenditure of the proceeds received from the sale thereof, are under the jurisdiction of this Commission." "The Arizona Corporation Commission, under the laws of the State of Arizona, have complete jurisdiction over an Arizona utility corporation in respect to any securities they may issue, not only as to the amount or type of such securities, but the purpose for which the proceeds may be used and also jurisdiction as to properties purchased and the price paid therefor." "The management of the Public Utilities Consolidated Corporation is in charge of the W. B. Foshay Company, whose experience and ability in public utility operation has been demonstrated. The local management is under the direct supervision of the Utilities Department of the W. B. Foshay Company, but the local personnel in many instances is made up of the men responsible for the past successful operation of such properties." "In this respect the Arizona Corporation Commission becomes a safeguard

to the public's interest insofar as the security holders of Public Utilities Consolidated Corporation are concerned."

It is true that the Arizona corporation laws as enacted and in force do contemplate that the state commission shall supervise and limit the issuance and sale of utility securities by Arizona corporations, to the end that approved properties at approved prices shall be acquired for the stock authorized to be issued and sold. The proof in this case is, however, that although the appellants did not cause any of the subsidiary's securities to be issued until after the Arizona commission had authorized the issue, the circumstance assured nothing of real safety to any investor in such securities because as soon as the securities were issued they were delivered into the hands of the Foshay Company, and thereupon, the appellants, through that company, sold the securities and used the money entirely as they saw fit and without recognizing any jurisdiction of the commission over the application of the money. They caused the securities to be hypothecated for Foshay Company loans and debts and as they sold the securities they commingled the proceeds with the Foshay Company's moneys and used and consumed them in that company's business.

The inquiry on this branch of the case was extended like the others, and endless details were disputed. But, about the main and controlling fact—the fact that the appellants took all of the securities which the Arizona corporation was authorized by the commission to issue into their own hands in the name of the Foshay Company and, through that company, sold, hypothecated, and otherwise disposed of them without regard to the authorized purpose of the issue, is manifest clearly from the appellants' own testimony. Mr. Henley, testifying for defendants, said as to the supervision of the Arizona commission: "Whenever they (the Commission) issued an order, they issued the order for a specific purpose to PUCC (the Arizona subsidiary). The order would authorize PUCC to issue certain securities, the proceeds of which were for a specific purpose, and PUCC complied with that order to the letter in that it entered into a contract with the Foshay Company (the holding company) to deliver that particular specific property for these particular specific securities so authorized, and beyond that there was no further jurisdiction." The only possible inference from this statement is that as the securities of the subsidiary company were issued they were put into the hands of the Foshay holding company, and thereafter, the appellants recognized no jurisdiction on the part of the commission, but, on the contrary, handled the securities and the proceeds, in the name of the Foshay Company, as they saw fit.

At the time of the receivership the Foshay Company had obtained from the Arizona subsidiary more than $5,000,000 of securities authorized by the commission to be issued for the particular purpose of acquiring certain specified properties, and the Foshay Company had almost completely disposed of the securities and its Arizona subsidiary had received none of the properties or anything else on account thereof. Beyond reasonable doubt, therefore, the representations made to induce investment in these securities to the effect that the Arizona laws and the supervision of the Arizona commission would assure safety to the investors in the securities was a false representation.

Upon this phase of the case, therefore, as upon the other, the real gist of the accusation, the falsity of the representation about the safeguards of the Arizona law and the supervision of the commission, was established and with reasonable brevity.

But, as in the other branches of the case, the appellants claim honesty and good faith. Their position is that after the PUCC securities came into the hands of the Foshay Company the Foshay Company had only an ordinary contractual obligation to go ahead and buy the properties and turn them over to PUCC, and that being simply a contractual obligation there could be and was no fraud in non-performance. They say they had a right to handle the business that way and did so in good faith.

It will be observed that whether they did have a right to so handle the matter or not presents no response to the charge of misrepresenting the assurance of safety accorded investors by reason of the Arizona laws and the jurisdiction of the Arizona commission. If they had full right through the Foshay Company to take over and sell the Arizona Company's securities and use the proceeds as they saw fit, and if the orders and directions of the Arizona commission were not binding upon the Foshay Company and it was not bound to follow the commission's orders as to the use and application of the proceeds, then certainly the representation about the safety assured by the Arizona jurisdiction was false. The only assurance that the proceeds of PUCC securities would be safely applied lay with the Foshay Company as conducted by Foshay and Henley, and they

recognized no jurisdiction over them on the part of the Commission. And so the gist of the accusation is fully sustained whether appellants' position as to their rights in the matter were correct or not.

The government, in order to show the contrast between the representation of safety to investors and the true facts, developed in detail the whole course of the relationships between the appellants and the members of the Arizona commission, the various applications for permits to issue securities, and the various orders thereon, and both verbal and written representations made about the matters by appellants, so that the testimony became extensive on the branch of the case. There are many objections and many exceptions taken, but the heart or gist of the accusation —the misrepresentation is in no wise obscure. The appellants used the representation to sell the stock that the "expenditure of the proceeds received from the sale of the securities was under the jurisdiction of the Commission and that the Commission became a safeguard to the interest of the security holders." The securities as soon as issued, were taken entirely out of the hands of the Arizona Company and the Foshay Company, under appellants' direction, thereafter acknowledged no further jurisdiction in the Arizona commission over the disposition of the securities or the proceeds thereof, but used all the proceeds for its own purposes. Such manner of conducting the business necessitated submission of the issue to the jury and justified the jury in finding that the representation was false.

There was a broad issue based on the stock selling representation of appellants that the Foshay stocks offered sound, conservative investments and on the charge of the indictment that the whole business was a mere dishonest stock, share and note selling scheme. According to the government, the dominant idea and business purpose of the appellants was to get money by the issue and sale of stocks to the public, rather than to earn money by giving electric, gas, water, rental space, and the like tangible services to customers at a profit on the investment. Its contention was that the extent of appellants' organized energies devoted to the stock selling, the fraudulent pretenses and devices resorted to to carry it on, the utter dependency of the dividend disbursements upon the stock selling and the use of proceeds from stock sales for the stock selling end of the business, compel the conclusion that the business did not afford a conservative investment, but was a dishonest stock selling scheme. On this phase of the case it was not the theory of the prosecution that the companies had no properties of sound value. The indictment, doubtless with intention, nowhere makes that charge. It will be remembered that the Foshay Company claimed to have utilities and other properties in Mexico, Honduras, Nicaragua, Quebec and Ontario, Canada, Alaska, and in twelve states of the Union, with a combined valuation of $50,000,000. As to some of the properties it appeared that nothing had been paid therefor but a small earnest money advance upon a contract to buy, but forthwith large valuations were set by appellants and they went into the Foshay picture (as their phrase was) and on the books. As there was no charge in the indictment that the values of the properties had been misrepresented by appellants, the government did not attempt to bring witnesses from afar to put figures on the properties. It confined its testimony to the theory on which the indictment was drawn. As to the abstract right of corporate officers to declare dividends, (independent of such specific false representations as we have already discussed), it took no exception to the instruction argued for by defendants and given by the trial court to the effect that corporation dividends can be lawfully paid out of any honest surplus of assets over liabilities, (a point of law upon which we express no opinion in this case); but it insisted that the surpluses were not honestly arrived at, that they were fraudulently made up to justify the monthly dividends and that the bookkeeping devices were to further the dishonest stock selling scheme.

Study of the testimony has convinced us that the issue was properly for the jury. The detailed transactions tending to support the accusations, elaborately discussed both on the trial and on this appeal, are too numerous for separate consideration and we must content ourselves with touching only upon outstanding instances.

It appeared that in 1927 the Foshay Company was compelled to sell its then principal subsidiary, the People's Light & Power Corporation, at a great loss. Thereupon, it started out to collect another group of properties and incorporated the Arizona corporation, called PUCC, to take such properties over when they should be acquired and to issue the stocks and securities which the Foshay Company would sell. During the next two years and few months until the receivership, the Foshay Company took over and sold approximately $20,000,000 of this (PUCC) company's securities, conducting the whole stock selling campaign on the representation that

PUCC was making money and earning and paying dividends every month and sending out monthly earning statements to every stockholder to that effect. At the time of the receivership the Foshay Company had thus disposed of more than five million dollars worth of PUCC securities, for which it had not turned over to PUCC any properties or other thing of value whatever.

The principal bookkeeping device by which appellants gave color to the pretense that PUCC was making an income on its stock issues under such impossible conditions was this: They simply caused great sums to be entered up on the books of the Foshay Company from time to time as charges against the Foshay Company on account of interest payable to PUCC; and on the books of PUCC they entered like sums as credits on account of interest due from the Foshay Company. The interest rate was indicated to be 14 per cent. on the amounts of the stock sales so that the figure would be large enough not only to pay PUCC's dividends, but also to create surplus for PUCC. For a while the Foshay Company carried this so-called double interest charge item on its own books as an expense, but later on appellants transferred the whole of the items on the Foshay books in such a way as to indicate that the amounts were an investment by the Foshay Company in the stocks of PUCC. When they were so entered as an investment the great sums that had stood as expense items were made to appear as additional assets on the Foshay Company books and were used to help make up a surplus to justify dividend disbursements of the Foshay Company. These bogus entries of interest items, that were in fact never paid by the Foshay Company, amounted in the aggregate to nearly as much as the total dividends paid out by PUCC and pretended to have been earned by that company from its utility properties.

Such juggling of figures could have nothing to do with the production and distribution of electricity, gas, or water, or with anything in which the investors in PUCC securities were concerned. Neither was it related to any honest belief appellants might have in their utility and other properties. It was simply a device to further their stock selling and it went to the whole scheme of the stock selling, dependent as that scheme was upon the pretense of continuous earnings and monthly dividends.

Another important Foshay Company project during the years in question was the Foshay Tower Building in Minneapolis. The Foshay Company organized a Building Company to hold that property and issue stock and Foshay contracted with the Building Company to take and sell the stock and to finish the structure at a certain figure. The mortgage bonds were floated in consideration of the contract and the stocks sold on the representation, amongst others, that there would be a saving in the execution of the contract and a surplus to go back to the Building Company, and that the stock would represent a certain equity in the property, subject to the mortgage and landlord's rights as to a part of the fee. But the Foshay Company accounts show that company claiming the cost of the building to be more than the contract amount by about a million and a quarter dollars. Letters between the appellants show that appellants intended, through their control of the situation, to make the Building Company pay that sum over and above the contract price, thereby impairing, if not destroying the value of the building stock sold to the public. The stock subscribers to the Building Company were deceived, but we cite the matter more particularly in relation to the Foshay Company's sales of its own stock. In connection with the Foshay building project, the Foshay Company took over a large amount of building company no par Class B common stock, and entered it on the Foshay books as an asset of great value. The Foshay Company did not depreciate the asset on account of the Building Company's million and a quarter debt. On the contrary, after the Foshay Company had parted with 7,420 shares of that stock of the carrying value on its books of $250,000, it made no deduction in its carrying account to reflect the reduced amount of shares on hand, but left the $250,000 asset to augment the surplus for dividends. Likewise in another similar transaction, where it was carrying Class B shares of PUCC stock on its books as an asset of large value, it gave 125,000 of the shares to one George B. Foreman & Co. in connection with a deal, the stock so given away having a carrying value on the books of the Foshay Company in the sum of $500,000. As in the case of the Class B Building Company shares, it made no deduction from its asset figures but left the $500,000 asset on its books, the same thing as a write-up, to swell the surplus for dividends.

Again, early in 1929 appellants had accomplished the changing over of the Foshay Minnesota Corporation into the Foshay Delaware Corporation, and immediately set about it to float a "$6 cumulative participating preferred share, series 1929, no par value" stock issue of the new company, and a smaller no.

par common stock issue to go with it; the valuation of such no par stock for stock selling to be related directly to net surplus shown by the company books at the time of issue. Into the book set-up of the new corporation there was injected on the asset side an item of $1,434,000. This item was put into the books and carried onto the balance sheet of the Arizona subsidiary corporation, called PUCC (and we have already called attention to the fact that PUCC only lasted a little more than two years, issued $20,000,000 worth of securities, and got nearly as much as its pretended dividends out of the bogus interest and double interest book entries, already considered). The $1,434,000 item was covered up in the item "Property, Plant and Equipment, $14,-972,851.00," but appeared in later reports shown before receivership as "Going Concern Value." The new corporation assumed to own the Class B no par stock of PUCC so that the write-up of the PUCC assets effected a corresponding increase of the assets and consequently the surplus of the new corporation, on which the proposed issue of the $6 cumulative, etc., no par stock was rested. After the reorganization and in 1929 these stocks were floated on the representation that the issues had behind them sufficient net surplus assets of the Foshay Company, which company was represented to be making money all the time, as above discussed. Some of the customers for the Foshay securities were financiers, and the discovery by them of the item "Going Concern Value" in the books of the PUCC corporation and related corresponding items in the books of the Foshay Company naturally aroused interest. Upon their inquiry, the witnesses for the government say that appellants simply prevaricated about it, telling them that although the item was called "Going Concern Value," it was made up almost entirely of cash investments in tangible property. The proof is clear that it was not, but was simply a write-up of assets.

The total net surplus which the appellants showed upon the books of the Foshay Delaware Company on the reorganization was something less than $3,000,000 and the significance of the writing up of the sum of $1,434,-000 in this way, and the items of $250,000 and $500,000, considered just above, is readily apparent. These and many analogous distortions having similar effect in the bookkeeping records of the several companies were all matters tending to sustain the broad accusation and requiring submission to the jury.

The first long trial of this case resulted in disagreement of the jury. This second trial consumed nine weeks. There are eleven volumes of the condensed testimony, and nearly fifteen hundred exhibits. The appellants make five hundred assignments of error and their briefs are very voluminous. The great labors, so reflected, were not occasioned by obscurity in the main gist of the fraud charged and proven, and it is neither feasible nor necessary to discuss in detail the countless points argued. Through months of labor we have considered them all.

Many are about the state of the public mind at the time of trial, the jury panel, and the jurors selected. It is true that the operations of appellants were on so vast a scale that thousands of persons were directly affected by the Foshay failures, and there was great public interest in the case. Appellants made a showing of poverty, preventing their making such preparations for defense as they might have made in their former financial position. It appears, however, that appellants were not crowded hastily into this trial soon after receivership; more than two years had intervened and they were ably defended by counsel learned, experienced, and indefatigable. That there was still great public interest, afforded no reason why they should escape trial, and the trial was properly had in the District of Minnesota, the venue of their offenses. Although some of the jurors were not learned in books, the record shows that they were each and all qualified jurors. None of the assignments on this phase of the trial are well taken.

■ As to the objections and assignments of error laid against the receipt in evidence of practically each one of the 1,489 exhibits, we have been unable to find any exhibit prejudicial to the appellants received over valid objection. The record discloses that the trial court was at great pains to require proper foundation to be laid and to be assured of the competency, relevancy, and materiality of each exhibit received. The books of the company and the entries therein were identified by persons thoroughly familiar with them, and responsibility for particular entries which tended directly to support the accusation was brought home to the appellants. All of the books and all of the entries upon which contentions were made were put in evidence and kept accessible, and the purport and result of the book entries were developed before the court and jury by skilled experts, and their conclusions, summaries, and opinions based on the book entries were properly received in evidence. 32 Corpus Juris, § 1303, p. 1017; Burton v. Driggs, 20 Wall. (87 U. S.) 125, 22 L. Ed. 299; Lemon v. United

States, 164 F. 953 (C. C. A. 8); Arine v. United States, 10 F.(2d) 778 (C. C. A. 9); Stephens v. United States, 41 F.(2d) 440 (C. C. A. 9); Butler v. United States, 53 F.(2d) 800 (C. C. A. 10).

Appellants complain with particular insistence upon the exclusion by the trial court of the Exhibit A-223, which they offered in evidence. Mr. Henley testified that he had caused this exhibit to be made up from the books of the company. The object of it was to show that the Foshay Company had such vast and valuable resources that it could easily pay the more than seven million dollars which it owed to its subsidiary, PUCC Arizona, and other millions of indebtedness, and to justify all of the surpluses that had been set up. But, on examination of the proffered exhibit, it fairly appeared that the exhibit did not conform to the book entries and that it was not made up from such entries. Some of the entries were from the books and some were not and there were high valuations of certain assets which were made up by Mr. Henley without regard to the books. The only effect of permitting the exhibit to go to the jury would have been to confuse the jury upon the vital matter of what the books really showed, and it was properly excluded by the court.

Although bitter complaint is made that Mr. Henley was not permitted to fully develop all of his claims about the great values that were in the properties of the company, we find no prejudicial error on this score. Mr. Henley was on the witness stand, on behalf of the defendants, about fourteen days and was afforded wide latitude to develop his estimates and theories of value and all of his explanations, excuses and justifications. Furthermore, the trial court properly gave the following broad instructions for the appellants' protection: "Under our system of law men are not punished for mere mistakes, mere mis-management, mere carelessness, or mere errors of judgment. They are punished only for intentional wrongdoing, therefore, no matter how unsound, how impracticable, how visionary a scheme may be, if there is no intention to defraud or obtain money by false pretenses or promises, there is no such scheme as is denounced by law."

It does appear that from time to time during the trial the court did not permit counsel for appellants to protract his examination to the full extent that he desired. As we recognize the right of cross-examination to be a most inviolable right of the accused, we have given special attention to those instances in which objections to questions on cross-examination were sustained. We are not satisfied that there was any matter of defense or explanation, or justification as to which appellants were denied their rights.

Other assignments have to do with the matter of the handling of the Arizona subsidiary's security issues by the Foshay Company and the trial court's instructions on the subject. It was apparently the personal opinion of the trial judge, reflected in recorded colloquy, that when the appellants took those PUCC security issues, which the Arizona commission had authorized for specific purposes according to the terms of its orders made at the appellants' own instance, and thereafter handled those securities in the name and for the uses of the Foshay Company, hypothecating them and applying the proceeds as they saw fit—in the judge's opinion such conduct reflected a wrongful conversion of the securities and the proceeds thereof. But, under the indictment the question whether appellants were guilty of criminal conversion or embezzlement was not presented—such was not the charge against them. Accordingly, when the court came to instruct the jury, he gave a clear, concise, and accurate statement of the requirements of the Arizona law concerning utility security issues and of the several commission orders made by the commission at the instance of appellants covering the security issues of their Arizona subsidiary—all of them being in evidence. The court then explained the purport and intent of those orders as manifested by the words and tenor thereof. Appellants now argue that there was nothing criminal about the Foshay Company's handling of the securities and the proceeds derived from the sale or hypothecation thereof by the Foshay Company. They insist that they had a written contract in each instance, drawn up between the Foshay Company and the subsidiary company, and that because of that contract the Foshay Company at once became the owner of the securities and only had a civil obligation to acquire and turn over specified properties to the subsidiary therefor. We think the court's instructions covered this matter with fairness to both sides. He did not obscure the real issue raised by the indictment and the plea, and he did not prejudice the appellants when he gave to the jury a correct summary of the true purport and intent of the Arizona law and the commission orders. He left the issue standing out clear to the jury whether or not, under the proof, the appellants were guilty

of the scheme to defraud and to obtain money by representations as charged in the indictment.

We find the instructions of the court, as a whole, submitted the issues fairly and none of the exceptions to instructions given or refused are well taken.

■ Complaint is made by appellants against the good character instruction given by the court. Sundry witnesses testified to the good reputation of the appellants, and it is obvious that if appellants had not had the confidence and good opinion of many people, they could not have sold them the paper securities amounting to $60,000,000. There are cases in which proof of the good reputation of an accused refutes any fair inference of his guilt, although the same circumstances proven against a notorious lawbreaker would ensure conviction. But, in this case, the instruction of the court that the jury "should consider the evidence of good reputation upon the question of whether or not the defendants did commit the crime" was sufficient, absent any request by appellants for a more elaborated instruction.

■ Several assignments have to do with the receipt of testimony concerning transactions before the securities commission in the state of Oregon. It was the claim of the government that in obtaining license to sell Foshay securities in that state corruption of the officers on the Oregon blue sky commission had been resorted to, and testimony was adduced on the matter by both the government and appellants. It was not proven that either Foshay or Henley caused a bribe to be given or corruption to be practiced, and when the testimony was all in on the subject, the trial court might well have instructed the jury to disregard all of it. On the other hand, the matter was within the scope of the inquiry under the indictment. The trial court could not know until the end of the trial whether the evidence on the subject would ultimately be sufficient to go to the jury. Although there were objections to the receipt of the testimony as it went in, no motion to strike the testimony on the subject was made at the conclusion of the trial. It cannot be assumed that the mere failure of the government to prove one of its points moved the jury in its verdict to convict. The appellants are not entitled to reversal because of the testimony received concerning the transactions had in connection with obtaining license to sell the company securities in Oregon. Nash v. United States, 229 U. S. 373, 33 S. Ct. 780, 57 L. Ed. 1232; Mathews v. United States, 15 F.(2d) 139 (C.

C. A. 8); Kaplan v. United States, 18 F. (2d) 939 (C. C. A. 2); Sasser v. United States, 29 F.(2d) 76 (C. C. A. 5); Havener v. United States, 49 F.(2d) 196 (C. C. A. 10).

■ We note also the assignment that the verdict of the jury was inconsistent, acquitting on some counts and convicting on others. This is not ground for reversal. Dunn v. United States, 284 U. S. 390, 52 S. Ct. 189, 76 L. Ed. 356, 80 A. L. R. 161.

The evidence on the whole case convinces that the Foshay financial structure was built upon false representations making people believe that it was a sound and conservative money-making institution, whose current gains and net earnings were honestly reflected in the payment of monthly dividends, whereas, all the time it was, in fact, merely a dishonest stock selling scheme and such other business as there was was a reckless adventuring upon the speculative chances of hoped for rises in property values.

Such was the gist of the charge. The trial was fair and the verdict of guilty conforms with the evidence.

The late WILLIAM S. KENYON was one of the Circuit Judges constituting the court before whom this appeal was argued. He sat in conference with the other judges and voted to affirm the judgment of the court below, but he came to his death before this opinion was written.

The judgments are affirmed.

### Indictment.

Excluding the formal part of the indictment, it is as follows:

That before and at the several times of the committing of the several offenses in this indictment hereinafter mentioned, Wilbur B. Foshay, Henry H. Henley, Harry E. McGinty, Clarence W. Salisbury, Raymond Joel Andrus, Palmer V. Mabry, Herbert F. Welch, each late of the city of Minneapolis, in said District, hereinafter called "defendants," each, then well knowing all the matters in this indictment set forth, did devise a scheme and artifice to defraud and to obtain money and property from divers other persons, then residing in different states of the United States, by means of false and fraudulent pretenses, representations and promises; that is to say, from the numerous class of persons (hereinafter called investors) who then were desirous of investing, or could be induced to invest, their moneys in the stocks, shares and notes of corporations conducted in good faith and hav-

ing for their objects one or more of the following:

(1) The furnishing and sale, to the general public, in several cities on the North American continent, to-wit: More than 100 such cities, of one or more public utilities, including transportation, gas, electricity, power, water, ice, telephone and telegraph;

(2) The furnishing of engineering, accounting, financial and management service to public utility, industrial and other corporations;

(3) The underwriting, sale and marketing of securities of public utility, industrial and other corporations;

That said investors were to be induced so to invest their moneys in one or more of the corporations hereinafter mentioned and to send and pay the same to said defendants by means of material false and fraudulent pretenses, representations and promises, made and to be made, in accordance with said scheme and artifice, to such investors, by said defendants, directly through personal solicitation by salesmen, and through personal correspondence and circular letters and indirectly by means of advertisements in the public prints, to the effect that they, the said defendants, were the managers and promoters in good faith of certain such corporations by them designated as

(1) W. B. Foshay Company (a Minnesota Corporation);

(2) W. B. Foshay Co. (a Delaware Corporation);

(3) Public Utilities Consolidated Corporation (a Delaware Corporation);

(4) Public Utilities Consolidated Corporation (an Arizona Corporation);
stocks, shares and notes of which, of great value, present and prospective, they, the said defendants, would sell to such investors, whereby such investors, as was to them pretended, represented and promised by said defendants, would be put in the way of receiving substantial profits and returns from, and without risk or loss of, their investments therein; which said false and fraudulent pretenses, representations, and promises were to be made by said defendants and by their agents, in accordance with said scheme and artifice, under the names of W. B. Foshay Co., (a Delaware Corporation), W. B. Foshay Company, (a Minnesota Corporation), Public Utilities Consolidated Corporation (a Delaware Corporation), and Public Utilities Consolidated Corporation, (an Arizona Corporation).

And the grand jurors aforesaid, upon their oath aforesaid, do further present, that to induce the investors to make purchases of stocks and shares in said corporations, the defendants caused large pretended and fictitious dividends to be paid monthly to the holders of such stocks and shares, which pretended and fictitious dividends were not in fact earned by the corporations paying the same, but were paid from the capital of such corporations.

And the grand jurors do further present that among the many false and fraudulent pretenses, representations and promises so made, and to be made, by said defendants, to the investors aforesaid, for the purpose of inducing such persons to invest their moneys in one or more of the corporations aforesaid, were the following, that is to say:

(1) That said corporations were already earning, and would continue to earn substantial returns for the persons owning and purchasing such notes, shares and stocks therein, and, that investments in the said notes, shares and stocks of said corporations, by reason of the honest and efficient management of the same by said defendants, were earning and would continue to earn appreciable and substantial profits and dividend returns, whereas, in truth and in fact, such returns, if indeed any existed, or would exist, were, as said defendants when committing said several offenses well knew, so very inconsiderable as to form no reasonable basis for any pretense, representation, or promise that such corporations were earning or would earn any returns to such investors at all commensurate with the moneys so to be invested by the persons aforesaid, or that the same offered or would offer profitable or desirable investments to such persons, or to any person, and on the contrary, the condition of each of said corporations, as said defendants, when committing said several offenses, well knew, by reason of the facts which said grand jurors upon their said oath charge to be the facts, that said defendants were not conducting and would not conduct the affairs of any of said corporations in accordance with good or settled business principles, or in good faith for the true benefit of such investors, but was such as to make the same unprofitable and losing corporations, and corporations worthless as the basis of investments, and whereas, in truth and in fact, said defendants were then knowingly conducting and would continue knowingly to conduct under the names aforesaid, a mere dishonest, and fraudulent stock, share and note selling scheme.

(2) That W. B. Foshay Company (a Minnesota Corporation) securities, namely the stocks, shares and notes of the said W. B. Foshay Company, offered a sound, conservative, and profitable investment, whereas, in truth and in fact, the securities of the W. B. Foshay Company did not offer a sound, conservative or profitable investment;

(3) That W. B. Foshay Co., (a Delaware Corporation) securities, namely the stocks, shares and notes of the said W. B. Foshay Co., offered a sound, conservative, and profitable investment, whereas, in truth and in fact, the securities of the W. B. Foshay Co. did not offer a sound, conservative or profitable investment;

(4) That because Public Utilities Consolidated Corporation, (an Arizona Corporation) was organized under the laws of the State of Arizona, and by reason thereof could not purchase any properties or issue any securities without having first satisfied the Arizona Corporation Commission that the issuance of its securities was for the best interests of the company and its stockholders, such facts were and are an assurance that the securities issued and to be issued were and are proper and that the corporation did and would secure full value therefor, whereas despite the fact that said Public Utilities Consolidated Corporation was incorporated under the laws of the State of Arizona and was under the jurisdiction of the Corporation Commission of that State, nevertheless, the said Public Utilities Consolidated Corporation did issue to the W. B. Foshay Co. (a Delaware Corporation) its securities in the value of more than $5,000,-000.00 in payment of utilities, and other assets and for which it received nothing;

(5) That the W. B. Foshay Co. (a Delaware Corporation) policy was and is to always safeguard each issue of securities sold by it as much as is possible for the full protection of the holders of such securities and such policy will be continued in strict accord with its slogan "All Your Money—All the Time—On Time," whereas, in truth and in fact, said W. B. Foshay Co. had no policy of safeguarding any issue of securities sold by it, and whereas, in truth and in fact, it concealed from such holders the true facts and conditions surrounding the corporations it managed and whose securities it sold and that it adhered to a policy of consistently misrepresenting the true earnings of such corporations;

(6) That the W. B. Foshay Company (a Minnesota Corporation) policy was and is to always safeguard each issue of securities sold by it as much as is possible for the full protection of the holders of such securities and such policy will be continued in strict accord with its slogan "All Your Money—All the Time—On Time," whereas, in truth and in fact, said W. B. Foshay Company had no policy of safeguarding any issue of securities sold by it, and whereas, in truth and in fact, it concealed from such holders the true facts and conditions surrounding the corporations it managed and whose securities it sold and that it adhered to a policy of consistently misrepresenting the true earnings of such corporations;

(7) That the net earnings of the W. B. Foshay Company (a Minnesota Corporation) for the year 1927, was the sum of $281,034.19, and that the net earnings of the W. B. Foshay Company (a Minnesota Corporation) consolidated with W. B. Foshay Co. (a Delaware Corporation) for the year 1928, was the sum of $432,427.64, whereas, in truth and in fact, there were no net earnings for the year 1927, but a net loss, and whereas, in truth and in fact, there were no net earnings for the year 1928, but a net loss;

(8) That the purchase of $6 Cumulative Participating Preferred shares, series 1929, of W. B. Foshay Co. (a Delaware Corporation), provided an opportunity to invest in shares of the said W. B. Foshay Co., which company was paying dividends of eight dollars per share per annum, whereas, in truth and in fact, said company was paying and would continue to pay said dividends, but out of capital and not out of earnings or surplus;

(9) That the management of Public Utilities Consolidated Corporation, an Arizona Corporation, by W. B. Foshay Co. (a Delaware Corporation) provided the shareholders of Public Utilities Consolidated Corporation with a high degree of safety of capital and a liberal return on their investment, whereas, in truth and in fact, W. B. Foshay management did not provide the shareholders with any degree of safety of capital nor did it provide a liberal, or any, return on their investment, and whereas, in truth and in fact, pretended and fictitious returns were paid, but were paid from capital and not from profits, earnings or surplus;

(10) That the management of Public Utilities Consolidated Corporation, an Arizona Corporation, by W. B. Foshay Company, a Minnesota Corporation, provided the shareholders of Public Utilities Consolidated Corporation with a high degree of safety of capital and a liberal return on their invest-

ment, whereas, in truth and in fact, W. B. Foshay Company management did not provide the shareholders with any degree of safety of capital nor did it provide a liberal, or any, return on their investment, and whereas, in truth and in fact, pretended and fictitious returns were paid, but were paid from capital and not from profits, earnings or surplus;

(11) That the net income of the W. B. Foshay Company (a Minnesota Corporation) is from operating earnings, whereas, in truth and in fact, said W. B. Foshay Company had no net income from operating earnings, and whereas, in truth and in fact, pretended earnings and pretended surpluses were created by making bookkeeping entries in the books of said corporation showing arbitrary appreciations in inventories of securities on hand;

(12) That the net income of the W. B. Foshay Co. (a Delaware Corporation) is from operating earnings, whereas, in truth and in fact, said W. B. Foshay Co. had no net income from operating earnings, and whereas, in truth and in fact, pretended earnings and pretended surpluses were created by making bookkeeping entries in the books of said corporation showing arbitrary appreciations in inventories of securities on hand and unrealized profits on agreements for the sale to Public Utilities Consolidated Corporation (an Arizona Corporation) of stocks and properties of utility corporations;

(13) That the net earnings of the W. B. Foshay Co. (a Delaware Corporation) for the year ending December 31, 1928, after depreciation, Federal Income Taxes, and all charges, were $432,427.64 or $16.61 a share on Preferred shares outstanding at December 31, 1928, whereas, in truth and in fact, said company had no net earnings but operated at a loss for the year ending December 31, 1928.

And the grand jurors aforesaid, upon their oath aforesaid, do further present, that said defendants, on August 8, 1928, at Minneapolis aforesaid, in said district and in the Fourth Division, so having as aforesaid, devised the scheme and artifice aforesaid, for the purpose and with the intent then and there on their part of executing said scheme and artifice, unlawfully and feloniously did knowingly place and cause to be placed in the post-office of the United States there, to be sent and delivered by the post-office establishment of the United States to the persons to whom the same was then and there directed a certain circular letter and a certain dividend check, to-wit, a circular letter and a dividend check then and there enclosed in an envelope then and there bearing United States postage in

the sum of two cents, pursuant to Permit No. 27, meter number 5464, and the following return card, direction and address, to-wit:

"W. B. Foshay Co.
Incorporated
Foshay Building
2nd Ave. South at 9th St.
Minneapolis    T. Louis Anderson & Mary Anderson, Box 2, Seton, Minn.

the said T. Louis Anderson and Mary Anderson, to whom said letter was so directed then being two of the persons of said class of persons so to be induced to invest their moneys in one or more of the corporations aforesaid, as said defendants then and there well knew, and which said circular letter and said dividend check then and there were and are of the tenor following, that is to say, (here follows letter) * * *

Against the peace and dignity of the United States, and contrary to the form of the statute of the same in such case made and provided.

The remaining counts adopt the scheme set forth in this count and are separate mailings.